# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-1816

_____

Bruce N. Rademacher, Colonel,     *
                                  *

          Appellant,     *

                                  *    Appeal from the United States
    v.                           *    District Court for the
                                  *    Eastern District of Missouri.

HBE Corporation,                  *
                                  *

          Appellee.     *

_____

Submitted: January 13, 2011
Filed: July 14, 2011

_____

Before WOLLMAN, LOKEN, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Bruce N. Rademacher appeals from the district court's[1] grant of summary judgment in favor of HBE Corporation (HBE) on his claims that HBE committed employment discrimination, in violation of the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301, *et seq*. We affirm.

_____

[1]The Honorable Henry E. Autrey, United Stated District Judge for the Eastern District of Missouri.

## I.

Frank Kummer, HBE's chief executive officer, hired Rademacher as a pilot for HBE's corporate jet on April 1, 2001. Kummer (himself a veteran of the Korean War) knew and considered favorably that Rademacher had served in the U.S. Air Force and had graduated from the Air Force Academy.

Rademacher signed up for the Air Force Reserve in 2003. Before enlisting, he told HBE's chief pilot, Gary Bain, that he planned to join the reserve. Bain urged Rademacher to discuss his plans with Kummer, but Rademacher declined to notify Kummer because "it's not required by law to tell your employer that you are a reservist or that you're planning on joining." When Kummer was asked whether he would have objected to Rademacher's enlistment, he responded, "I might have had I known. I might have sat down with Gary and with Bruce and made sure that I understood it better, but that didn't happen because I didn't know about it." According to Rademacher, in October 2003, after learning he had enlisted, Kummer said to him, "God damn it. I don't like it. Why didn't you talk to me first. This better not inconvenience me."

From October 2003 to August 2006, Rademacher requested leave for reserve duty approximately once a month. HBE granted the requests and hired contract pilots during his absences. Bain occasionally asked Rademacher to rearrange his reserve schedule—which Rademacher said was "fine, and I didn't mind doing that"—and Bain also could not recall an instance when he had difficulty scheduling a contract pilot to fulfill Rademacher's role as subordinate pilot. Each time Rademacher returned from duty, he was reinstated to his position. In April 2006, HBE granted Rademacher's request for extended leave, from April 14 to June 15, 2006, and reinstated him upon completion of his reserve duty.

Rademacher and Kummer had an ongoing dispute regarding flight safety issues. In September and December 2005, Rademacher claimed visibility was limited for their scheduled nighttime flights and that the jet should not depart from Eagle, Colorado. Whether the limited visibility resulted in unsafe conditions was a matter of disagreement among pilots. In both instances, Kummer told Rademacher something to the effect of, "If you don't want to work for me, you can quit."

In December 2005, Rademacher began looking for other employment and making plans to "exit [HBE] on [his] own terms." Rademacher's wife had accepted a job offer that required her to relocate, and in late December 2005 or early January 2006, she and the couple's children moved to Texas. Rademacher put their Missouri home on the market and continued to work at HBE. He also prepared two letters in anticipation of his resignation: one that he intended to send to HBE employees, advising why he no longer wanted to work for the company, and one that he intended to send to the Federal Aviation Administration (FAA), alleging unsafe practices. He kept the letters in his flight bag—along with a digital recorder—intending to present them to Kummer upon his resignation.

In January 2006, Rademacher missed a flight because he had gone to the gym and did not answer his phone when Bain called. Kummer expressed dissatisfaction that Rademacher was unavailable. Rademacher alleges that, at some point, Kummer told him that he had been "hired to be available 24/7; if you are not, you are no good to me."

Rademacher attempted to conceal his plans to leave HBE. He told Bain that his wife had not accepted the job she had been offered in Texas. Rademacher testified that he did not tell the truth about his plans because "Fred [Kummer] would use that to terminate me." When asked why he thought that Kummer would use the information to discharge him, Rademacher responded, "That's Fred. That's his personality. There is (sic) too many stories out there of him doing the exact same

thing to other people." In June or July 2006, Bain learned of Rademacher's plans through a mutual acquaintance. Rademacher later told Bain that "the reason why I didn't tell you I was . . . moving and the house was on the market because I know if Fred found out back in April, he would have fired me in April probably."

In July or August 2006, Kummer and Bain met to discuss plans for the jet's maintenance, which required that the plane be out of service for six to eight weeks, beginning in mid-August. Kummer mentioned during the meeting that he was "entertaining the idea of letting Bruce go." Bain told Kummer that "the problem will solve itself" and "revealed that Bruce's wife had already left and he had his house on the market." Kummer later explained that he had realized that Rademacher "was becoming more dissatisfied with his life and work at HBE. Having decided that the situation was not a healthy one for Bruce, myself and others who became involved with our flying operation, I decided we needed to deal with the situation."

On August 11, 2006, following the final flight before the jet's scheduled maintenance, Kummer discharged Rademacher. Unbeknownst to Kummer, Rademacher recorded the conversation. After confirming that Rademacher's house was on the market and that Rademacher was moving to Texas, Kummer said:

> I'm going down for a month and a half or two months, and it seems that we ought to cut this thing off right here, and I've enjoyed flying with you, but I don't think it makes sense for us—I've got to get out and start looking for a pilot that is going to be with us when we get back so that we can do all the—whatever in the world we've got to do to get back into the swing of things. I haven't really gotten into the finalization. I'll get together with [human resources] and work it out on Monday, and we'll—and then we can put together the end of it. And then, like I said, I've enjoyed knowing you. I wish you good luck in Texas. Whereabouts in Texas are you going to live?

Rademacher replied, "Dallas," and Kummer responded, "I like Dallas. It's a nice city. Okay. Good." Rademacher then turned off the recorder and handed to Kummer the letter he had written to the FAA.[2]

Following his discharge, Rademacher called Bain and surreptitiously recorded their conversation. The men rehashed their disagreement about whether Rademacher should have told Kummer that he planned to enlist in the reserves before doing so. In the context of that discussion, Rademacher asked Bain whether Kummer had ever said "anything negative towards my reserve duty." Bain responded, "Not that I know of, other than the fact that he probably said he didn't like it." In his deposition, Bain explained that he was referring to the fact that Rademacher had joined the reserves without providing Kummer notice and that he came to that conclusion because "had I been in Fred's position, I wouldn't have liked it and I wouldn't have expected any person in Fred's position to like it." Rademacher also asked whether Kummer was upset that he had been on military leave for two months, Bain responded,

> I was surprised that he wasn't, but I didn't see any of it. In fact, he got another pilot and, you know, I don't think he minded that you were gone at all. . . . The other [pilot] was a hell of a lot more pleasant. So, no. He didn't mind that you were gone, and he never said anything to me about it at all. Nothing.

Rademacher testified that during the jet's down time, he planned to undergo shoulder surgery, obtain flight recertification, and continue his job search. The surgery would have required Rademacher to refrain from flying for at least thirty days. The five-day flight recertification course was transferable. When asked whether Rademacher "wouldn't have been performing any duties for HBE during that period of time because the plane was down," Rademacher responded, "Correct."

_____

[2]Rademacher lodged his complaint with the FAA, but it was not pursued.

Rademacher filed suit in August 2008, alleging that his military service was a motivating factor in HBE's decision to discharge him, in violation of 38 U.S.C. § 4311, and that HBE terminated him without cause, in violation of § 4316(c)(2). During the discovery period, HBE's third-party administrator for unemployment compensation produced its records regarding Rademacher's termination. Those documents showed that on August 15, 2006, the third-party administrator entered a code that indicated Rademacher was terminated for "unsatisfactory work performance" and that on August 23, an HBE employee notified the administrator that the code was wrong and that Rademacher's discharge was involuntary, but that HBE did not contest the unemployment compensation benefits. HBE later filed a motion for summary judgment on both claims, which district court granted.

## II.

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Clegg v. Ark. Dept. of Corr., 496 F.3d 922, 926 (8th Cir. 2007). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

USERRA "prohibits employment discrimination on the basis of military service." Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 551 (8th Cir. 2005) (internal quotation marks and citation omitted). "Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." Id. (quoting Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13 (4th Cir. 2001)) (alterations omitted); Lisdahl v. Mayo Found., 633 F.3d 712, 718 (8th Cir. 2011); see also Henderson v. Shinseki, 131 S. Ct.

-6-

1197, 1206 (2011) (concluding that, in light of the "canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor[,]" there is no clear indication that the deadline for filing a notice of appeal with the Veterans Court was intended to be jurisdictional).

A.

As relevant to this case, USERRA provides that a person who belongs to a uniformed service shall not be denied "retention in employment . . . or any benefit of employment by an employer on the basis of that membership." 38 U.S.C. § 4311(a). Accordingly, an employer violates USERRA when the employee's membership "in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . ." § 4311(c)(1).

The employee must make the initial showing that military status was a motivating factor in the adverse employment action. Maxfield, 427 F.3d at 551. "If the employee makes such a showing, the employer must prove, by a preponderance of the evidence, that the action would have been taken despite the protected status." Id. (internal quotation marks and citations omitted). Rademacher argues that summary judgment was improper because there exist genuine issues of material fact whether his military service was a motivating factor in HBE's decision and whether HBE would have terminated his employment regardless of his military service.

To determine whether Rademacher's membership in the uniformed services was a motivating factor in his discharge, we consider a variety of factors, including the employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, the proximity in time between the employee's military activity and the adverse employment action, and any inconsistencies between the proffered reason and other actions of the employer.

Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001). Rademacher may show discriminatory motivation with direct or circumstantial evidence. Id.

Rademacher has failed to present sufficient evidence to allow a reasonable jury to find that HBE was hostile to his membership in the uniformed services. Taking the evidence in the light most favorable to Rademacher, Kummer was angry that Rademacher enlisted in the Air Force Reserves. Kummer did not want Rademacher's military leave to inconvenience him; he expected his pilots to be available "24/7." After Kummer's initial frustration, however, HBE handled Rademacher's military absences without comment or incident, hiring contract pilots during those absences and reinstating Rademacher when he returned. Kummer made no further derogatory comments about Rademacher's military service.[3] The frustration Kummer expressed about Rademacher's enlistment in 2003, without more, is insufficient to support an inference that Rademacher's membership in the Air Force Reserves was a motivating factor in HBE's decision to discharge him. Cf. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1189 (2011) (noting that veteran's supervisors "were hostile to Staub's military obligations" and listing the supervisors' actions and derogatory comments that showed hostility).

The timing of Rademacher's termination also fails to support his argument that his membership in the uniformed services was a motivating factor in HBE's decision.

---

[3]Rademacher's allegation that Kummer's executive assistant heard Kummer "rant and rave" about his reserve duty is inadmissible hearsay. Thus, we cannot consider it in rendering our opinion. Shaver v. Indep. Stave Co., 350 F.3d 716, 723 (8th Cir. 2003) ("There are limits on what kinds of evidence a judge may consider in reviewing a motion for summary judgment, and inadmissible evidence . . . cannot be used to defeat such a motion."). Moreover, Rademacher's deposition testimony that Kummer "also threatened to fire me several times over my reserve duty" is insufficient to support an inference of hostility because Rademacher failed to present any evidence regarding the circumstances, timing, or substance of the alleged threats.

Rademacher served in the Air Force Reserve for almost three years before he was terminated from HBE, and as stated above, HBE routinely granted his requests for military leave. Rademacher had returned from reserve duty approximately two months before his discharge. HBE's conduct with respect to Rademacher's monthly reserve duty, as well as the passage of time between his return from leave and his discharge, weakens any inference that his military service was a motivating factor in HBE's decision to terminate him.

Finally, Rademacher contends that there are inconsistencies within HBE's proffered reasons for his termination and that those inconsistencies reveal an improper motive in HBE's decision to discharge him. HBE's reasons for termination, however, have not varied: Rademacher was in the process of relocating to Texas, his wife and children had moved to Texas, his house in Missouri was for sale, and HBE's jet would be out of service for six to eight weeks. Kummer's statement that Rademacher had "essentially resigned" does constitute an inconsistency, in light of the fact that Kummer's reasons for drawing that conclusion are the same as the reasons he gave for terminating Rademacher: "When a man has relocated his family and has his house up for sale, those set of facts were very obvious and clear to me . . . [t]hat he had quit essentially." Likewise, the coded documents produced by HBE's third-party administrator do not support an inference that HBE gave inconsistent reasons; HBE promptly corrected the reason for termination to reflect that the discharge was involuntary, not that Rademacher was discharged for "unsatisfactory work performance." At most, the record suggests that Rademacher's temperament and dissatisfaction with his work at HBE may have played a part in Kummer's decision to terminate him.

Rademacher has failed to set forth sufficient evidence to allow a jury to find that his membership in the uniformed services was a motivating factor in HBE's decision to terminate him. Moreover, even taking the facts in the light most favorable to Rademacher, the record shows that HBE would have terminated Rademacher

regardless of his military service.  We thus conclude that the district court properly granted summary judgment in favor of HBE on this claim.

## B.

Rademacher also appeals from the district court's grant of summary judgment on the claim that HBE terminated him without cause, in violation of USERRA. Section 4316(c) temporarily changes the at-will employment status of returning veterans.  If the employee's military service was more than thirty days but less than 181 days, the employee cannot be discharged "except for cause" within the first 180 days of reemployment.  38 U.S.C. § 4316(c)(2).  The statute does not define the term "cause," but it grants the Secretary of Labor authority to prescribe regulations implementing USERRA "with regard to the application of this chapter to . . . private employers."  § 4331.

Under that authority, the Department of Labor has issued a regulation entitled, "What constitutes cause for discharge under USERRA?"  20 C.F.R. § 1002.248.  The regulation provides:

> The employee may be discharged for cause based either on conduct or, in some circumstances, because of the application of other legitimate nondiscriminatory reasons.
>
> (a)     In a discharge action based on conduct, the employer bears the burden of proving that it is reasonable to discharge the employee for the conduct in question, and that he or she had notice, which was express or can be fairly implied, that the conduct would constitute cause for discharge.
>
> (b)     If, based on the application of other legitimate nondiscriminatory reasons, the employee's job position is eliminated, or the employee is placed on layoff status, either of these situations

-10-

> would constitute cause for purposes of USERRA. The employer bears the burden of proving that the employee's job would have been eliminated or that he or she would have been laid off.

Id. The regulation thus distinguishes between cause based on conduct and cause based on economic conditions. HBE argues that its decision to terminate Rademacher was based on his conduct. Accordingly, we must determine (1) whether HBE has proved that it was reasonable to discharge Rademacher for his conduct and (2) whether Rademacher had notice that his conduct would be cause for discharge.

In Keserich v. Carnegie-Illinois Steel Corp., the Seventh Circuit concluded that the cause intended by the statute need not be legal cause, but "may be such cause as a fair-minded person may act, and where such action is not arbitrarily taken with a purpose or as an excuse to avoid the statute, it is cause within the meaning thereof." 163 F.2d 889, 890 (7th Cir. 1947); see S. Rep. 103-158, at 58 (1993) ("'Just cause' has been defined . . . as a cause for discharge upon which a fair-minded individual might act.") (citation to Keserich omitted); see also H.R. Rep. No. 103-65, at 19 (1993) ("[T]he extensive body of case law that has evolved over that [fifty-year] period, to the extent that it is consistent with the provisions of this Act, remains in full force and effect in interpreting these provisions."). Accordingly, an employer may discharge a returning veteran for conduct that is not recognized as a legal cause and does not necessarily constitute misconduct, but it must be "fair to discharge the veteran because of his conduct." Hillman v. Ark. Highway & Transp. Dep't, 39 F.3d 197, 200 (8th Cir. 1994) (citing Carter v. United States, 407 F.2d 1238, 1244-45 (D.C. Cir. 1968)).

HBE contends that it was reasonable to discharge Rademacher based on his conduct in searching for a job in Texas, moving his family to Texas, and placing his Missouri home for sale, particularly in light of the fact that HBE's jet would be out of service for six to eight weeks. We agree that HBE's decision to terminate

Rademacher made good business sense—why pay a pilot who plans to leave the company and who might depart while the company's jet is temporarily grounded?—and also conclude that Rademacher's actions constituted conduct that would give a fair minded employer to act. HBE's decision to discharge Rademacher was not arbitrary, and there is no evidence to suggest that HBE tried to evade the statute.

Contrary to Rademacher's contention, conduct-based cause is not limited to employee misconduct. The standard set forth in the regulation, and rooted in the case law, is one of reasonableness: whether "it is reasonable to discharge the employee for the conduct in question." 20 C.F.R. § 1002.248(a). Accordingly, although "grounds of discharge that do not violate any law when applied to an unprotected employee—say, that the employer dislikes the employee (without having any reason other than intuition, or personality preference)—do not constitute statutory 'cause' to fire a returning veteran," the employer meets its burden of proof if it "satisfies some objective standard of cause." Carter, 407 F.2d at 1245. Taking the facts in the light most favorable to Rademacher, HBE has met that objective standard, showing that it was reasonable to discharge Rademacher.

Rademacher also had notice that his conduct would constitute cause for discharge. As set forth above, Rademacher repeatedly acknowledged that he was aware that he would be discharged for his conduct. For example, during his phone conversation with Bain, Rademacher explained that he had concealed the facts that he intended to move and had put his home on the market "because I knew if Fred found out back in April, he would have fired me in April probably." Although Rademacher contends that the notice was inadequate because he was only on notice that Kummer might "arbitrarily retaliate against him" for his plans to leave the company, we find unpersuasive the comparison of his case to that of an employee who "may have heard that the employer arbitrarily fired or punished other employees for their religious preference, baseball team preference, sexual orientation, or other

personal matters." Appellant's Br. at 20-21. We find nothing arbitrary about HBE's decision, and we conclude that Rademacher was on notice that his conduct would result in his discharge.

## III.

We affirm the judgment. We grant HBE's motion to strike the portions of Rademacher's appendix that were not presented to the district court and deny Rademacher's motion for leave to supplement the record.

_____